IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 24, 2019 Session

**STATE OF TENNESSEE v. BILLY MCCARTY AMYX**

**Appeal from the Criminal Court for Hawkins County**
No. CC16CR75     Alex E. Pearson, Judge

_____

**No. E2018-01733-CCA-R3-CD**

_____

A Hawkins County jury convicted the Defendant, Billy McCarty Amyx, of filing a false report and fabricating evidence, and the trial court imposed an effective sentence of six years in the Tennessee Department of Correction. The Defendant appeals, asserting that the evidence does not support his convictions and that the trial court abused its discretion when it ordered him to serve six years. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

George Todd East, Kingsport, Tennessee, for the appellant, Billy McCarty Amyx.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Ryan Blackwell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from unsubstantiated allegations that Jeremy Weaver shot the Defendant. A Hawkins County grand jury indicted the Defendant for filing a false report and fabricating evidence. At the trial on these charges, the parties presented the following evidence: Former Hawkins County Sheriff's Department deputy Myran Southerland testified that on March 18, 2016, he was dispatched at around 3:00 p.m. to a residence on Woodland Lane regarding a "[shots] fired complaint." Upon arrival, Mr. Southerland found the Defendant lying against a building with a gunshot wound to his

hand.  The Defendant told Mr. Southerland that John Weaver, his ex-girlfriend's new boyfriend, had shot him.

Hawkins County Sheriff's Department Detective Keith Long testified that he reported to an address on Woodland Lane in reference to a shooting.  Upon arrival, other officers informed Detective Long that the Defendant was the owner of the residence and had been shot by John Weaver.  Detective Long collected samples of blood "droplets" found on the roadway in front of the Defendant's mobile home and shell casings.  The Defendant had already been transported to Holston Valley Medical Center for treatment when Detective Long arrived, but the detective spoke with Gregg Mitchell, who had been present during the shooting.

Detective Long recalled that Mr. Mitchell stated that he had been helping the Defendant repair his roof.  Mr. Mitchell was inside a shed getting more screws when he heard what sounded like an argument followed by gunshots.  He went outside and saw a "smaller" black car with a Toyota sticker "across the top of it."  Mr. Mitchell recognized the driver as John Weaver.  Detective Long did not speak to any other witnesses at the scene but took several photographs, which he identified for the jury.

Detective Long testified that after photographing the scene, interviewing Mr. Mitchell, and collecting evidence, he went to Holston Valley Medical Center to speak with the Defendant.  The Defendant provided a statement to Detective Long, who wrote down the Defendant's statement for him.  He then read the statement to the Defendant, and the Defendant confirmed that the statement was accurate before signing it.  Detective Long read the statement to the jury as follows:

> Today around 3 p.m., me and my friend, Greg Mitchell, were working on a shed at my house.  Greg had went inside the shed, and I was coming off the ladder.  I saw a dark black or a dark blue car with Toyota across the top of the windshield.  The car was going toward Church Hill and was going real slow.  I knew the car belonged to John Weaver.  He drives through there a lot but had never stopped.  I know John because my ex-girlfriend, Rebecca, is living with him.  John stopped in the road.  His driver's window was down, and he started telling me he was taking care of my ex and saying things about me.  I started walking toward the road.  He said when I got to jail next month he was going to take care of my 19-month-old daughter like a real man should.
>
> I jumped over my chain link fence and intended to punch him.  I saw his right hand come up . . . and saw a gun.  With my left hand I started reaching toward the gun that was now pointed at my face.  I remember

noticing that John had black gloves on. I grabbed at the gun to keep from getting shot in the face. The gun went off, and I spun around and hit the ground. I grabbed the bumper and started around the back of the car and went toward the passenger side.

I think John was taking his seatbelt off, and then he pointed the gun at me but the window was up.

I heard my friend, Greg, yelling, and John sped off, almost running over my foot.

My friend, Greg, was at the fence, and I realized then I'd been shot. While I was on the ground after the first shot, I heard at least two more.

Greg pulled the fence down and helped me over, and then he called 911.

While at the hospital, Detective Long observed the Defendant's injuries. He recalled that it appeared that the Defendant had a gunshot wound to his left hand, describing it as a "through and through shot." Detective Long identified photographs taken of the Defendant's injuries at the hospital.

Detective Long testified that he contacted the Johnson City Police Department and asked that an officer be dispatched to Mr. Weaver's address to detain him for questioning. When Detective Long arrived at the residence, Mr. Weaver was detained in the back of one patrol vehicle and Rebecca Roberts, the Defendant's ex-girlfriend, was detained in a separate patrol vehicle. Detective Long spoke with Mr. Weaver, informing him that he had been accused of shooting the Defendant. Detective Long stated that Mr. Weaver appeared confused but was "very cooperative" with the investigation. Mr. Weaver consented to a search of his residence and vehicle.

Detective Long testified that, in Mr. Weaver's garage, he found a dark-colored Scion with a Toyota sticker across the top of the windshield. As he inspected the vehicle he saw blood in areas consistent with the Defendant's version of the events. Detective Long proceeded to the passenger side of the vehicle and noticed that the car door had been opened "and two shell casings had fallen from the inside of the vehicle and were laying [sic] on the ground beside the car." He clarified that the shell casings were .22 caliber. Detective Long also found "droplets" of blood on the driver's side of the car, blood on the passenger side of the vehicle and blood at the top of the passenger side

window.  Detective Long found weapons during the search of the residence but did not find a .22 caliber weapon.

Detective Long testified that he had Mr. Weaver and Ms. Roberts transported to the sheriff's office for further questioning.  Mr. Weaver "adamantly denied" any involvement in the shooting; however, after interviewing Mr. Weaver and reviewing "parts" of Mr. Weaver's cell phone, Detective Long charged Mr. Weaver with attempted murder.

In an attempt to confirm the Defendant's allegations, Detective Long obtained video surveillance from Mr. Weaver's place of employment, Hutchinson Sealing Systems, and information regarding the time he had clocked out of work on March 18, 2016.  The State played a portion of the surveillance video that showed Mr. Weaver leaving work in his car at 2:41 p.m.  The video footage was consistent with the time indicated on Mr. Weaver's timecard.  Additionally, Detective Long accessed the Google location service on Mr. Weaver's cell phone which showed that he was at his place of employment in Church Hill, Tennessee at 2:41 p.m.  Information accessed through Mr. Weaver's cell phone also indicated that Mr. Weaver was in Johnson City at Sam's Club from 3:16 p.m. to 3:38 p.m. on March 18, 2016, "driving" from 3:38 p.m. to 4:08 p.m. and from 4:30 p.m. to 5:04 p.m. and, finally, at a Texas Roadhouse restaurant in Johnson City, Tennessee, from 5:04 p.m. to 5:50 p.m.

Detective Long testified that he confirmed the location information recovered from Mr. Weaver's cell phone by obtaining surveillance video from the Sam's Club that showed Mr. Weaver in the Sam's Club at 3:16 p.m. and a receipt time-stamped 3:27 p.m.  The shooting had been reported at 3:00 p.m., and the distance between the Sam's Club and the location of the shooting was thirty-one miles.  Detective Long drove the distance between the two locations in thirty-nine minutes.  He reported driving the speed limit for most of the drive, stating that he drove "with the flow of the traffic."

Detective Long testified that he also accessed Mr. Weaver's call history.  The call history showed that a call was placed on Mr. Weaver's cell phone at 2:45 p.m. on March 18, 2016.  The call duration was nine minutes and twenty-seven seconds.  There were two missed incoming phone calls from Gary Henard at 2:51 and 2:52 p.m. and then a ten minute and fifty-five second phone call from Gary Henard at 3:03 p.m.

After obtaining this evidence, Detective Long began to question the timing of the events so he spoke with Mr. Mitchell again.  Detective Long informed Mr. Mitchell of the discrepancies in the timing of the events.  After interviewing Mr. Mitchell, Detective Long reviewed the Hutchinson Sealing Systems surveillance video again.  Mr. Mitchell drove a 2005 Ford F-150 truck with two-tone gray paint and distinct wheels.  The

- 4 -

surveillance footage showed a truck that looked like Mr. Mitchell's entering the Hutchinson Sealing Systems parking lot at 2:35 p.m. In the video, a car parked next to Mr. Weaver's Scion drove away, and Mr. Mitchell's truck parked in the empty space. An individual exited the passenger side of Mr. Mitchell's truck and stood on the driver's side of Mr. Weaver's Scion. At 2:41 p.m., the video showed Mr. Weaver's vehicle leaving the parking space. Detective Long acknowledged that the video did not show the individual on the passenger side of the Scion but explained that the video "skipped" and there was a thirteen second gap in the recording beginning at the time the individual could be seen standing at the driver's side door of the Scion.

Detective Long testified that the blood collected at the shooting scene and from Mr. Weaver's Scion was sent to the Tennessee Bureau of Investigation ("TBI") for analysis. The DNA profile from both blood samples matched the Defendant's DNA profile.

Detective Long testified that the distance from the Hutchinson Sealing Systems parking lot to the Defendant's house was approximately three miles and took approximately six minutes to drive. The distance between Hutchinson Sealing Systems and Sam's Club was approximately thirty-four miles.

Lisa Meadows, Director of Human Resources for Hutchinson Sealing Systems, testified about the procedure used by hourly employees to check in and out of work. She explained that the facility used a biometric screening time clock, which required an employee to scan their hand in order to "clock in" or out for the day. According to the business records, Mr. Weaver began his work day at 6:16 a.m. and concluded his day at 2:38 p.m.

Sam's Club manager Chastity Piatt testified that Sam's Club was a membership-based wholesale club that provided members with a required membership card that must be "swipe[d]" in order to make a purchase. Ms. Piatt identified an electronic journal receipt that was housed in the company's local data base. The document provided the date, time, transaction number, club number, register identification, cashier number, and membership information. Ms. Piatt identified a transaction made by John Weaver on March 18, 2016, at 3:27 p.m. She also identified a "normal register receipt" that was consistent with the information from the electronic journal receipt. Finally, Ms. Piatt identified a "membership data base." Employees can use the data base to access information about member accounts. This document also reflected Mr. Weaver's March 18, 2016 purchase.

John Weaver testified that he had worked in the machine shop at Hutchinson Sealing Systems for fifteen years. On March 18, 2016, he worked the day shift from 6:30

a.m. to 2:30 p.m. He arrived early to work and drank his coffee for a few minutes before entering the building. At the end of the day, Mr. Weaver changed his shoes, clocked out, and then walked out to his car with another employee, Fred Armstrong. Mr. Weaver described for the jury where he had parked his car in the parking lot on that day.

Mr. Weaver testified that he made several phone calls as he drove up the interstate on his way to Sam's Club to get some pet supplies. One of the calls was to Total Insurance regarding a recent medical procedure Mr. Weaver had undergone. Mr. Weaver identified the Total Insurance phone number on the call log for his cell phone. The other call was to Gary Henard, a fellow employee, who Mr. Weaver called to ask if he needed anything from Sam's Club. He and Mr. Henard had several missed attempts at contacting one another by phone but ultimately connected at 3:03 p.m. and spoke for ten minutes and fifty-five seconds. After Mr. Weaver finished his conversation with Mr. Henard at approximately 3:13 p.m., he entered the Sam's Club. Mr. Weaver bought the pet supplies and then made the ten to twelve minute drive home. Mr. Weaver recalled that, at the time, Ms. Roberts, who was a friend from work, was staying at his home while she found an apartment of her own. Mr. Weaver denied that he and Ms. Roberts ever dated or were romantically involved.

Mr. Weaver testified that, upon arriving home that day, he took a shower and changed clothes, and then he and Ms. Roberts went to Texas Roadhouse restaurant for dinner. After dinner, they made a few stops before returning home. After Mr. Weaver parked his car in the garage, he decided to mow his back yard. He took out his mower and began mowing the lawn when he noticed police cars on the road in front of his residence. He stopped the mower and walked toward the front of the house and was met by police officers who asked his name and then handcuffed him and placed him in a patrol car.

Mr. Weaver testified that he waited in the patrol car for approximately an hour and a half before Detective Long arrived and spoke with him. Mr. Weaver consented to officers searching his residence and vehicle. After the officers finished the search, Mr. Weaver was transported to the Hawkins County Justice Center where he again spoke with Detective Long. Mr. Weaver recounted his day to the Detective, but the Detective told Mr. Weaver that Mr. Weaver had gone to the Defendant's house and shot him. Mr. Weaver stated that he felt he was "being railroaded" and requested an attorney. Mr. Weaver was returned to the holding cell and then processed for the charge of attempted murder. Mr. Weaver was unable to pay the $750,000 bond, so he remained in jail for nineteen days before his release.

Mr. Weaver testified that he hired an attorney who hired an investigator. Together with Detective Long's work, their investigation revealed a timeline that resulted in the

dismissal of the charge against Mr. Weaver. Mr. Weaver testified that he did not know the Defendant and had never met him before. He confirmed that he was aware that Ms. Roberts had lived with the Defendant and that the two shared a child. Mr. Weaver stated that he had never been to the Defendant's residence, and he did not know where the Defendant lived. Mr. Weaver denied owning a .22 caliber gun. He said that he owned a 9 millimeter handgun and two shotguns that he disclosed to Detective Long before the officers searched his house.

Mr. Weaver testified that, in his experience, it is generally a forty-five minute drive from his home to his work and more than a thirty minute drive from his place of work to Sam's Club.

Michael Smith, testifying for the defense, recalled installing carpet in the Defendant's home. He stated that it was before the March 18 "incident" but could not remember how long before. While working at the Defendant's residence, he saw a black car driving down the road. When shown a picture of Mr. Weaver's car, Mr. Smith agreed that the car in the photograph resembled the car he had seen when working at the Defendant's residence. On cross-examination, Mr. Smith agreed that he considered the Defendant a friend. Mr. Smith further agreed that he noticed the car because the Defendant had stated, "There he goes again." Mr. Smith was unable to see the driver of the vehicle and did not see where the car went. On redirect examination, Mr. Smith clarified that the black car had a white Toyota sticker on the windshield.

James Persinger, the Defendant's neighbor, testified that he was seated on his porch smoking on the afternoon of March 18, 2016, when he saw a black car with tinted windows. The car was distinct because the windshield of the car had the word "Toyota" in big, white letters. Mr. Persinger stated that he had seen this vehicle drive by on four or five occasions but never saw the driver of the vehicle.

On cross-examination, Mr. Persinger confirmed that he lived "two doors down" from the Defendant. Mr. Persinger agreed that he considered the Defendant his friend. Mr. Persinger estimated that it took approximately forty or forty-five minutes to drive from his house to Johnson City. He stated that it was not possible for him to drive that distance in sixteen minutes.

Carrie Rymer testified that she cleaned the Defendant's house on March 18, 2016, arriving at around 9:30 a.m. When she arrived, the Defendant, "a bearded man," and "Jim Davis" were at the residence. She remained at the residence until 2:45 p.m. Ms. Rymer recalled that about two weeks before the alleged shooting she saw a black car with a Toyota sticker on the windshield drive slowly by the Defendant's residence. The State

showed Ms. Rymer a photograph of Mr. Mitchell's gray truck and she denied seeing the truck at the Defendant's residence on March 18, 2016.

Jim Davis, the Defendant's long-time friend, testified that he went to the Defendant's residence on March 18, 2016, to help him work on a "chicken building" along with Greg Mitchell. Mr. Davis said that he arrived at the Defendant's residence at around 8:00 a.m. and left at 2:45 p.m. As Mr. Davis drove away from the Defendant's residence he passed a black Honda with a Toyota sticker across the windshield that he had seen before in that area. He recalled seeing the black car drive slowly by the Defendant's residence.

Mr. Davis testified that several minutes after leaving the Defendant's residence, Mr. Mitchell called him and told him that the Defendant had been shot in the hand. Mr. Davis returned to the Defendant's residence and found the Defendant in the yard with his shirt wrapped around his hand.

Clinton Rogers and Gary Short were driving home on Woodland Lane on March 18, 2016, when they saw something in the road. As they drove closer, they saw that it was a person. Mr. Rogers, the driver, stopped the car to check on the man who was "hollering" for the men to "to get some blue towels." Mr. Rogers wrapped the blue towels around the man's bleeding hand to try to stop the blood flow. Mr. Rogers described the man as being in shock and "panicky." Mr. Short also perceived that the man appeared to be in shock and noted that the man was in pain as evidenced by his "moaning [and] groaning." Mr. Rogers and Mr. Short helped the man out of the roadway and stayed with him until police arrived.

In 2016, Joy Williams lived "a few houses" down from the Defendant. Ms. Williams testified that she walked in the area near her home for exercise. She recalled on March 18, 2016, that as she walked down the road, she observed the Defendant "doing something on top of the building." She walked further down the road and then turned around and began the walk back when she heard the Defendant yelling. She could not see the Defendant because a group of trees blocked her view, but when she reached a point where she could see the Defendant, he had come down from the roof and was walking toward the roadway. She then heard something that sounded like "fireworks" or "a car backfiring." She continued walking and a car drove by her at a fast rate, causing Ms. Williams to jump "out of the road because [she] thought they were going to hit" her. She said the car was black with tinted windows and a big, white Toyota sticker across the windshield. Ms. Williams was unable to see the driver due to the speed and tinted windows on the car. Ms. Williams stated that she had never seen that car in the neighborhood before.

Richard Arnold testified that in March 2016, he lived on Woodland Lane and that he had known the Defendant most of his life. On March 18, 2016, he had mowed "the trailer park" on Woodland Lane and was preparing to leave. As he pulled out on to Woodland Lane, a black car, driving at a high rate of speed, almost hit him. The black car had Toyota in white letters across the windshield.

After hearing this evidence, the jury convicted the Defendant of filing a false report and fabricating evidence. At the sentencing hearing the trial court sentenced the Defendant as a Range I, standard offender. The Defendant was convicted of filing a false report, a Class D felony with a sentencing range of two to four years, and fabricating evidence, a Class C felony with a sentencing range of three to six years for a standard offender. The trial court found no mitigating factors applicable and applied three enhancement factors: (1) the Defendant had a history of previous criminal convictions or criminal behavior; (2) the Defendant possessed or employed a firearm during the commission of the offense; and (3) the Defendant was released on pretrial bail at the time he committed the offense in this case. The trial court imposed a sentence of four years for the filing a false report conviction and six years for the fabricating evidence conviction. Finding no basis to support consecutive sentencing, the trial court ordered that the sentences run concurrently. In considering alternative sentencing, the trial court found the Defendant's acts of deception and manipulation "reprehensible" and specifically stated that deterrence was necessary in denying an alternative sentence. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant makes seven claims, challenging the sufficiency of the evidence or the weight of the evidence. For purposes of our review, however, we address all of his claims under the sufficiency of the evidence standard. *See State v. Adams,* 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Additionally, he contends that the trial court abused its discretion in sentencing. The State responds that the evidence is sufficient to support the Defendant's convictions and that the trial court did not abuse its discretion in ordering an effective sentence of six years' incarceration in this case. We agree with the State.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*,

91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption

of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

### 1. Filing a False Report

It is a criminal offense for a defendant to initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern, knowing that the offense or incident did not occur or that the information relating to the offense is false. *See* T.C.A. § 39-16-502(a)(1) (2014).

The evidence, considered in the light most favorable to the State, proved that, at the scene of the shooting, the Defendant told former Deputy Southerland that Mr. Weaver had shot him. The Defendant identified the same perpetrator to Detective Long at the hospital and after review of his statement to Detective Long regarding the incident, signed the document evidencing his affirmation of the statement. As a result, Mr. Weaver was arrested and incarcerated for nineteen days before the investigation revealed a sufficient alibi for Mr. Weaver. Evidence obtained from multiple businesses proved that Mr. Weaver was at locations a significant distance from the Defendant's residence and engaged in phone calls during the time period the Defendant claimed he was shot by Mr. Weaver. This evidence shows that the Defendant identified Mr. Weaver as the shooter when he knew that the information was false.

The Defendant challenges his identity as the perpetrator based upon circumstantial evidence. We note that the Defendant relies on old law regarding circumstantial evidence. As stated above, "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The Defendant argues that the poor quality of the Hutchinson Sealing Systems surveillance video does not "establish the identity of the individual shown to be walking around" and thus the evidence is insufficient to support this conviction. The identification of a defendant is a question of fact for the determination of the jury after consideration of the proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). The State's evidence showed that the Defendant was with Mr. Mitchell on the day of the shooting. The jury watched surveillance video of a truck that looked like Mr. Mitchell's truck parked next to Mr. Weaver's Scion and the passenger of the truck walking around the Scion. TBI DNA testing matched the blood on Mr. Weaver's Scion with the Defendant's DNA. By its verdict, the jury accredited the testimony of the State's witnesses and made reasonable inferences based upon the circumstantial evidence.

- 11 -

The Defendant also makes an argument that the false report must be related to an "underlying crime" that the police are investigating and because the State's theory of the case was that the Defendant shot himself, there was no "underlying crime." The relevant statute, however, refers to false statements about "an offense or incident within the officer's concern." T.C.A. § 39-16-502 (a)(2)(A). The report of a shooting to 911 constitutes an incident within an officer's concern. The Defendant falsely identified Mr. Weaver to officers investigating the shooting. By providing a false statement about an offense or incident within the officer's concern, the Defendant hindered the officer from investigating the incident. Further, the Defendant's false statement facilitated his use of the criminal justice system to torment a man whom the Defendant believed was dating his ex-girlfriend.

Finally, the Defendant appears to make an attack on venue based upon the Defendant's statement at the hospital which he alleges is not in Hawkins County. We agree with the State that the Defendant has waived any challenge to venue as it was not identified in his motion for new trial. Nonetheless, the jury could properly consider the Defendant's statement to Detective Long at the hospital. Tennessee Rule of Criminal Procedure 18 provides that an offense may be prosecuted in either county if elements of an offense are committed in different counties.

Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for making a false report to law enforcement. The Defendant is not entitled to relief as to this issue.

## 2. Fabricating Evidence

The Defendant argues that there was no ongoing investigation at the time the Hutchinson Sealing Systems surveillance video was recorded and thus, the evidence is not sufficient to sustain his conviction for fabricating evidence. The State responds that the Tennessee Supreme Court in *State v. Smith*, 436 S.W.3d 751 (Tenn. 2010, has interpreted a pending investigation within the context of the fabricating evidence statute, Tennessee Code Annotated section 39-16-503, to mean an investigation that is "impending" or "about to take place" and as such, the evidence is sufficient to support this conviction. *Smith*, 436 S.W. 3d at 763. We agree with the State.

Tennessee Code Annotated section 39-16-503 provides that:

(a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to:

. . . .

- 12 -

(2) Make, present, or use any record, document or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.

The evidence, viewed in the light most favorable to the State, proved that the Defendant was with Mr. Mitchell on the day of the shooting. A truck that appeared to be Mr. Mitchell's can be seen on the Hutchinson Sealing Systems surveillance video parking next to Mr. Weaver's Scion at 2:35 p.m. A male exited the passenger side of the truck and walked around to the driver's side of Mr. Weaver's Scion. The video contained some gaps, one lasting thirteen seconds during the time the person can be seen standing next to Mr. Weaver's car. The Defendant's blood was found on the driver's side door, trunk, and passenger window of Mr. Weaver's Scion. The Defendant reported to police these locations as points of contact after he had been shot. The investigation revealed the course of Mr. Weaver's day after leaving work at 2:41 p.m., placing him at locations that are significant distances from the Defendant's residence at the time of the shooting. From this evidence, a jury could draw reasonable inferences that the Defendant went to Mr. Weaver's place of work and placed his blood on Mr. Weaver's car in preparation for the impending investigation and with the intent to have Mr. Weaver arrested for an alleged shooting.

Accordingly, we conclude that there is sufficient evidence from which the jury could conclude, beyond a reasonable doubt, that the Defendant placed blood on Mr. Weaver's car with knowledge of its falsity as evidence that Mr. Weaver shot the Defendant, and with the intent to affect the course or outcome of the investigation of the shooting. The Defendant is not entitled to relief as to this issue.

### B. Sentencing

The Defendant challenges the trial court's sentencing decisions, arguing that the trial court erred in imposing the statutory maximum sentence for each conviction and in denying alternative sentencing. The State responds that the trial court did not abuse its discretion when it sentenced the Defendant to an effective six years' incarceration. We agree with the State.

Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"

*State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708. We are also to recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The trial court should consider enhancement and mitigating factors when determining the appropriate sentence; however, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2012); *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The

burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-3-303(b); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *State v.* Ashby, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

The trial court determined the Defendant should be sentenced as a Range I, standard offender. Then, after considering the principles of the Sentencing Act and the arguments for and against the mitigating and enhancement factors proposed by the parties, the trial court imposed within-range sentences. The sentencing range for a Range I sentence for filing a false report, a Class D felony, is two to four years, and the trial court imposed a sentence of four years. The sentencing range for a Range I sentence for fabricating evidence, a Class C felony, is three to six years, and the trial court imposed a sentence of six years. The trial court stated its reasons for imposing these sentences on the record, and those reasons were consistent with the principles and purposes of the Sentencing Act.

- 15 -

The trial court applied enhancement factor (1), that the Defendant had a previous history of criminal convictions or behavior in addition to what was necessary to establish him as a Range I offender. T.C.A. § 40-35-114. The presentence report shows that the Defendant has two prior felony convictions thereby supporting the trial court's application of this factor. In this case, the trial court found two additional factors to support sentences that were the maximum within the range. The trial court also applied enhancement factor (9), that the Defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. T.C.A. § 40-35-114. The trial court did not give much weight to this factor but based upon the facts at trial, concluded that the Defendant either actually or constructively possessed the gun that inflicted his gunshot wound. Finally, the trial court applied enhancement factor (13), that the Defendant was released on bail at the time of the offense and was ultimately convicted of the prior misdemeanor or felony. *Id.* We note that "a trial court could increase the sentence to the maximum within the range if it found even a single enhancement factor." *State v. Cross*, 362 S.W.3d 512, 528 (Tenn. 2012); *see also, State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012) (holding, enhancement of a sentence does not necessarily require the application of an enhancement factor provided that there are other reasons consistent with the purposes and principles of sentencing). Based upon our review, the record supports the trial court's decisions with regard to the length of the sentences.

As to the trial court's denial of an alternative sentence, the Defendant argues that the trial court failed to make the additional findings articulated in *State v. Hooper*, 29 S.W.3d 1, 13 (Tenn. 2000), related to a finding of deterrence as a basis to deny an alternative sentence. The State responds that that the additional findings per *Hooper* are only required when it is the sole basis for the trial court's denial of an alternative sentence and, in this case, while the trial court explicitly found deterrence as a factor, the trial court implicitly found that confinement was necessary to avoid depreciating the seriousness of the offense. We agree with the State.

At the sentencing hearing, the trial court spoke at length about the circumstances of the offense, describing the Defendant's conduct as "reprehensible." The trial court noted that, but for the timeline developed by Detective Long based on receipts and surveillance video, "it's likely that instead of you standing here being convicted, it would be the other way around, which would be a terrible miscarriage of justice given what the jury found." The trial court went on to describe the Defendant's actions and the immediate police response required of such an allegation, as well as the detailed plan and intention required to plant blood evidence in preparation for the execution of the plan to frame an innocent person. The trial court then distinguished this case from the fact patterns in other cases where a defendant claims their car was stolen in an attempt to

evade a DUI charge, in contrast to this case, which involved using the criminal court system to inflict harm on an innocent person.

Consideration as to whether confinement is necessary to avoid depreciating the seriousness of the offense and/or particularly suited to provide effective deterrence to others likely to commit similar offenses are valid considerations under Tennessee Code Annotated section 40-35-103. When denying probation on the sole basis of the offense itself, "the circumstances of the offense as particularly committed in the case under consideration must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense." *State v. Trent*, 533 S.W.3d 282, 292-93 (Tenn. 2017). This necessarily requires the trial court to examine and make findings regarding the particular circumstances surrounding the defendant's commission of the convicted offenses.

In our view, the trial court denied the Defendant probation to avoid depreciating the seriousness of the offense and to provide effective deterrence to others likely to commit similar offenses. In the course of its ruling, the trial court properly examined and made findings regarding the egregious circumstances of the crimes. "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014). The Defendant has not shown the order of incarceration in this case "wholly departed from the relevant statutory considerations." As such, the Defendant is not entitled to relief on this issue.

Accordingly, because the trial court imposed sentences within the appropriate range, considered the purposes and principles of the Sentencing Act, and considered the applicable enhancement and mitigating factors, we uphold the trial court's effective sentence of six years of confinement.

## III. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

- 17 -